
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. **19CR119CVE** |
| Plaintiff, | ) ) | **INFORMATION** |
| v. | ) ) | [18 U.S.C. § 371: Conspiring to Offer or Pay Health Care Kickbacks; Forfeiture Allegation: 18 U.S.C. § 982(a)(7), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Health Care Fraud Forfeiture] |
| JOHNATHON YATES BOYD, III, a/k/a "Tres Boyd," | ) ) ) ) | |
| Defendant. | ) ) | |

**FILED**
JUN 1 3 2019
Mark C. McCartt, Clerk
U.S. DISTRICT COURT

THE UNITES STATES ATTORNEY CHARGES:

## THE CONSPIRACY AND ITS OBJECT

1. From in or about November 2012 to the date of September 25, 2014, in the Northern District of Oklahoma and elsewhere, the defendant, **JOHNATHON YATES BOYD, III, a/k/a "Tres Boyd" ("BOYD")**, did knowingly and willfully conspire, confederate, and agree with each other and others, known and unknown to the United States Attorney (collectively "the Conspirators"), to commit offenses against the United States, that is, violations of Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to physicians to induce the physicians to refer individuals to pharmacies operated and controlled by Christopher R. Parks ("Parks") and Gary Robert Lee ("Lee"), for the furnishing of items and services for which payment may be made in whole or in part under a Federal health care program, as described below.

## THE PURPOSE OF THE CONSPIRACY

2.     The purpose of the Conspiracy was to unlawfully enrich the Conspirators, including **BOYD**, at the expense of the United States Treasury and private insurers, through the corrupt practice of bribing physicians to write prescriptions for expensive compounded drugs and to submit those prescriptions to pharmacies controlled and operated by Parks and Lee, thereby enabling the Conspirators to submit large claims for payment of the costly prescriptions to various Federal health care programs, and to divide among the Conspirators the profits from the federally-paid claims.

## MANNER AND MEANS OF THE CONSPIRACY

The Conspirators used the following manner and means to achieve the object of the Conspiracy:

### Compounded Drugs Compared to Standard, FDA-Approved Drugs

3.     "Compounding" a prescription was a practice in which a licensed pharmacist or licensed physician combined, mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA") were unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Compounded medications were prescribed and mixed for specific patients with particular needs; they were not to be mixed and marketed in bulk quantities. Compounded drugs were not FDA-approved. That is, the FDA did not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

4. Compounded drugs were often far more expensive than drugs approved by the FDA for the treatment of the same physical condition and were commonly reimbursed by Federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

### The Pharmacies

5. From in or about the fall of 2012 and continuing through 2015, Parks and Lee conjointly began to acquire, own and operate pharmacies through which they could market compounding services, including:

    a. OK Compounding, LLC, of Skiatook, Oklahoma ("OK Compounding");

    b. One Stop RX, LLC, of Tulsa, Oklahoma ("One Stop");

    c. NBJ Pharmacy, LLC, of Houston, Texas ("NBJ"); and

    d. Airport McKay Pharmacy of Houston, Texas ("Airport McKay").

(Collectively "the Pharmacies").

### R&A Marketing Recruits Physicians to the Pharmacies Through Bribes and Kickbacks

6. In or around 2012, **BOYD** formed R&A Marketing, LLC ("R&A Marketing"), a Texas Limited Liability Company located at Houston, Texas.

7. Beginning in September 2012, **BOYD**, through R&A Marketing began recruiting physicians, including Dr. Jerry Keepers ("Keepers") and Dr. Adam Arredondo

3

("Arredondo") to write prescriptions for compounded drugs and to submit those prescriptions to the Pharmacies for fulfillment.

8. The physicians, including Arredondo and Keepers, did not provide any services to the Pharmacies. Instead, the Conspirators paid kickback payments to physicians so that the physicians would refer their patients to the Pharmacies with prescriptions for compounding medications paid by Federal healthcare programs.

9. In exchange for paying kickbacks to physicians to be Medical Director or Consulting Physicians for the Pharmacies, **BOYD** was paid a commission based upon reimbursed prescriptions for compounded drugs written by the recruited physician that were filled by the Pharmacies.

10. To facilitate the submission of compounded drug prescriptions to the Pharmacies, the Conspirators provided pre-printed prescription pads to physicians. The pads contained a selection of compounding formulas so that a physician could simply check a box to indicate a preferred formula. In addition, the pads bore the facsimile numbers of the Pharmacies so that the physician's staff would easily know where to submit the prescription.

11. Instead of providing compounded pain medication prescriptions directly to their patients, who would then be free to select a pharmacy, the bribed physicians sent the prescriptions directly to the Pharmacies.

### The Conspirators Disguise the Bribes and Kickbacks

12. In order to disguise the bribe and kickback payments to physicians, the Conspirators created sham business arrangements with physicians to promote the

4

appearance that the Pharmacies were paying the physicians for legitimate services, rather than for prescribing and referring compounded drug prescriptions.

13. The sham business arrangements took several forms including, but not limited to, the following:

    a. Contracts between the Pharmacies and physicians who purportedly provided "Medical Director" or "Consulting Physician" services to the Pharmacies in exchange for payments at designated rates. The alleged services included reviewing charts, participating in meetings with the Pharmacies, developing policies, and answering clinical questions for the Pharmacies' staff and treating physicians. Some physicians provided time logs purporting to substantiate the services they provided. In actuality, the physicians did not provide to the Pharmacies any services other than writing compounded drug prescriptions and submitting them to the Pharmacies.

    b. Limited liability companies ("LLCs") owned and operated by the Pharmacies and physicians, who submitted compounded drug prescriptions to the Pharmacies. After the Pharmacies received payments for the prescriptions, the Conspirators transferred the profits to the LLCs for division among the physicians and the Pharmacies.

    c. Recruitment of physicians as "Medical Directors" for a bogus medical study purportedly conducted by R.U., an institution of higher education known to the United States Attorney. In actuality, the physicians performed no work in furtherance of any medical study because no legitimate study existed, as the

Conspirators well knew. Nonetheless, the Conspirators paid those physicians for writing compounded drug prescriptions and submitting them to the Pharmacies.

    d.    Even after bribes and kickbacks ceased to be paid to physicians, the Conspirators continued to conceal the true nature of the payments.

### The Payment Process and Federal Programs

14.    Pharmacy Providers of Oklahoma ("PPOK") was a company that represented independent pharmacies in negotiations with insurance companies and that oversaw pharmacy billing processes. A majority of contracts with insurance companies and Federal health care programs were in the name of PPOK as the administrator. Prescriptions flowed from client pharmacies through PPOK for billing to insurance companies and Federal health care programs. Select RX and the Pharmacies were clients of PPOK, which handled their billing processes.

### TRICARE

15.    TRICARE provided health care coverage for the United States Department of Defense ("DOD") beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

16.    Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of DOD, was the military entity responsible for overseeing and administering the TRICARE program.

17. TRICARE provided coverage for certain prescription drugs, including certain compounded drugs, if the drugs were medically necessary and prescribed by a licensed physician.

18. Express Scripts was the company that administered the TRICARE prescription program. If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable co-pay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, which would in turn adjudicate the claim and reimburse the pharmacy. To become a TRICARE network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste and abuse.

19. OK Compounding and One Stop, through PPOK, or their subsidiary RXLinc, submitted claims for prescription compounding drugs it dispensed to TRICARE beneficiaries.

## Medicare

20. Medicare provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services.

21. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number. Health care providers who provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

22. To participate in Medicare, a provider was required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

23. A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services and products provided to Medicare beneficiaries.

24. Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

25. Medicare Part D provided coverage for outpatient prescription drugs. Medicare beneficiaries were able to obtain Part D coverage through: (1) enrollment in one of many prescription drug plans ("PDP"), which covered only prescription drugs and were offered by qualified private insurance plans (often referred to as drug plan "sponsors"), which received reimbursement from Medicare; or (2) a Medicare Advantage plan that covered both prescription drugs and medical services. A beneficiary was responsible for any deductible or co-payment required under his or her PDP.

26. Medicare reimbursed providers for certain compounded drugs that were medically necessary to the treatment of a beneficiary's illness or injury, were prescribed

by a beneficiary's physician or a qualified physician's assistant acting under the supervision of a physician, and were provided in accordance with Medicare regulations and guidelines that governed whether a particular service or product would be reimbursed by Medicare.

27. A pharmacy provider was required to provide certain information when filing claims with Medicare. This information included identification of the person or entity that provided the medication, identification of the medication that was provided, identification of the prescribing physician, identification of the beneficiary, and the date the prescription was dispensed.

28. OK Compounding and One Stop, through PPOK, or their subsidiary RXLinc., submitted claims for prescription compounding drugs it dispensed to Medicare beneficiaries.

## The FECA Program

29. The Federal Employees' Compensation Act, Title 5, United States Code, Sections 8101, et seq. ("FECA") provided certain benefits to civilian employees of the United States, for wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee (the "FECA program"). The Office of Workers' Compensation Programs ("OWCP"), a component of the United States Department of Labor ("DOL"), administered the FECA program.

30. When a qualified employee suffered a work-related injury, the employee filed a claim for coverage with OWCP, which then assigned the claimant an OWCP claim number.

9

31. To obtain reimbursement for prescription drugs provided to OWCP claimants (hereinafter referred to as "beneficiaries"), a pharmacy had to submit its prescription claims for payment to OWCP, using the beneficiary's OWCP claim number. By submitting a claim for reimbursement with OWCP, the pharmacy provider certified that the service or product for which reimbursement was sought was medically necessary, appropriate, and properly billed in accordance with accepted industry standards.

32. OWCP would process the claims submitted by the provider and, if all required information was included, OWCP would reimburse the provider in accordance with an established fee schedule.

33. OK Compounding, through PPOK, or their subsidiary RXLinc, submitted claims for prescription compounding drugs it dispensed to FECA beneficiaries.

## CHAMPVA

34. The Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) is a federally funded program in which the Department of Veterans Affairs shares the cost of certain health care services and eligible beneficiaries. To be eligible for CHAMPVA, the patient cannot be eligible for TRICARE.

35. CHAMPVA provides coverage to the spouse or widow(er) and to the children of a Veteran who is rated permanently and totally disabled due to a service connected disability, or was rated permanently and totally disabled due to a service connected condition at the time of death, or died of a service-connected disability, or died on active duty and the dependents are not otherwise eligible for Department of Defense TRICARE benefits.

36. CHAMPVA covers most health care services and supplies that are medically and psychologically necessary. This includes reimbursing medication costs. CHAMPVA is always the secondary payer to Medicare and covers Medicare's co-insurance or cost share.

37. TRICARE, Medicare, the FECA Program and CHAMPVA were at all relevant times "Federal health care programs," as defined by Title 42, United States Code, Section 1320a-7b(f), that affected interstate commerce.

### Payments to Physicians

38. From in or about November 15, 2012 to in or about August 19, 2014, **BOYD** paid $311,725.00 in kickback payments to physicians recruited by R & A Marketing. The kickback payments were in exchange for the physicians to write compounding prescriptions to the Pharmacies. Some of the compounding prescriptions were reimbursed by federal programs including Tricare, Medicare, the FECA Program, and CHAMPVA.

### **OVERT ACTS**

In furtherance of the Conspiracy, the Conspirators committed the following overt acts, among others, in the Northern District of Oklahoma and elsewhere:

39. On the following dates, **BOYD** caused kickbacks to be paid to physicians in the approximate amounts listed below:

| OVERT ACT NO. | DATE | AMOUNT |
|---|---|---|
| 1 | November 15, 2012 | $10,000 |
| 2 | July 7, 2014 | 10,000 |

All in violation of Title 18, United States Code, Section 371.

## HEALTH CARE FORFEITURE ALLEGATION
## [18 U.S.C. § 982(a)(7), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), Title 18. United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

Upon conviction of the health care conspiracy to pay kickbacks offense alleged in Count One of this Information, as part of his sentence, the defendant, **JOHNATHON YATES BOYD III,** shall forfeit to the United States any property, real or personal, constituting or derived from, directly or indirectly, the proceeds traceable to such offense, including but not limited to:

### MONEY JUDGMENT

A money judgment in an amount of at least $1,411,440.19, because such amount represents proceeds obtained by Defendant **JOHNATHON YATES BOYD, III,** as a result of such health care offense.

Defendant, **JOHNATHON YATES BOYD III**, further agrees to pay and forfeit $311,725 as a substitute asset, pursuant to such money judgment, as additional restitution. Upon forfeiture of such sum, the criminal forfeiture money judgment will be reduced, accordingly. The defendant agrees that four weeks prior to sentencing he will pay such sum of $311,725 by Cashier's Check made payable to U.S. Marshals Service and delivered to the United States Attorney.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), defendant shall forfeit additional substitute property,

13

up to the value of the property described above if, by any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All pursuant to Title 18, United States Code, Section 982(a)(7), Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

R. TRENT SHORES
UNITED STATES ATTORNEY

*/s/ Melody N. Nelson*
MELODY N. NELSON
Assistant United States Attorney